ANAMARIA P. MATOS,

        Plaintiff,

        v.

ELISABETH DEVOS, Secretary,
Department of Education,[1]

        Defendant.

Case No. 16-cv-2069 (CRC)

## MEMORANDUM OPINION

Anamaria Matos suffers from a sensitivity to fragrances which made it difficult for her to come into the office without feeling ill. Unfortunately for Matos, her job as an IT manager at the U.S. Department of Education required at least some physical presence in the office. The Department tried to find Matos an equal-paying position that would allow her to work from home and, when that effort failed, provided her a specialized filter and mask that she indicated would alleviate her symptoms. Nonetheless, Matos sued the Department, alleging that it failed to accommodate her condition and created a hostile work environment based on her disability status. The Department has moved for summary judgment. Because Matos has presented insufficient evidence to support her claims, the Court will grant the motion.

## I. Factual Background

Plaintiff Anamaria Matos began working for the Department of Education as a Federal Student Aid IT Security Compliance Manager in 2010. Def.'s Mot. Dismiss & Summ. J.

_____

[1] This suit was originally filed against former Secretary of Education John King. Secretary Elisabeth DeVos, as Secretary King's successor, has been automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).

("Def.'s MSJ") Ex. 1 ("Matos Dep."), at 8:4–9, 8:24–9:3. At the start of her tenure, Matos had a "4-10" schedule, meaning she worked four days a week for ten hours a day. Id. 11:6–8, 12:24–13:1. Her schedule was eventually changed in November 2013—after Dr. Linda Wilbanks became Matos's supervisor—to a traditional five-day weekly schedule because Matos needed to attend meetings on Fridays that she had been missing. Id. 15:7–11, 16:5–9.

In early 2011, Matos began experiencing symptoms of multiple chemical sensitivity, a condition marked by headaches, nausea, and dizziness brought on by exposure to perfumes and other fragrances. Id. 9:11–24, 10:20–11:2. She informed her supervisor and, upon her request, was transferred from a cubical to a private office with a door. Id. 12:5–20. She requested no other accommodations at that time. Id. at 12:21–23. Following construction work on her office building in January and February 2014—during which Matos and the other employees teleworked, id. 18:9–13—Matos's condition worsened. Id. 18:20–19:16. She reported feeling lightheaded and nauseous and experienced headaches whenever she came into the office. See Pl.'s Opp'n Def.'s MSJ ("Pl.'s Opp'n") Ex. 5 (emails from Matos describing her symptoms).

On March 26, 2014, Matos submitted a formal request for an accommodation related to her condition. Def.'s MSJ Ex. 9 (March 26, 2014 accommodation request). (The Court apologizes for all the dates; as will be apparent later, they are relevant to Matos's claims and hopefully will aid in any appellate review.) In it, Matos requested that she be assigned a 100% telework schedule. Id. The Department referred Matos's request to the Federal Occupational Health service ("FOH"), an agency within the government that provides job-related health services for federal employees. Def.'s MSJ Ex. 14. While FOH evaluated the request, the Department sent Matos letters updating her on its status and permitted her to telework as much as her job duties allowed. See Def.'s MSJ Ex. 16 (May 5, 2014 letter); id. Ex. 18 (June 18, 2014

letter); id. Ex. 19 (June 26, 2014 letter); id. Ex. 20 (July 3, 2014 letter); see also Matos Dep. 27:21–28:4 (testifying that she was allowed to telework until June or July 2014); Def.'s MSJ Ex. 7, at 321, 325 (Wilbanks EEO Affidavit) (discussing Matos teleworking). However, as Matos's supervisor Wilbanks explained, some of Matos's job duties, such as training the employees she supervised or attending staff meetings, required her physical presence in the office. See Def.'s MSJ Ex. 15 (April 8, 2014 email).[2]

FOH issued its report to the Department on July 8, 2014, concluding that Matos was a disabled individual. Def.'s MSJ Ex. 21. Matos received the report about two weeks later, on July 21, 2014. Def.'s MSJ Ex. 22 (July 2014 email chain). Wilbanks then met with Matos to discuss the report and noted that "the probability is that [Matos's] current position cannot accommodate 100% telework." Id. Wilbanks and Matos discussed what sort of positions Matos might be able to assume that would enable her to have a full-time telework schedule. See Def.'s MSJ Ex. 23 (July 21, 2014 email). The Department also began a search for such a vacant position. See Def.'s MSJ Ex. 26 (January 22, 2015 letter).

On September 4, 2014 the Department requested that FOH evaluate Matos's accommodation request further. Def.'s MSJ Ex. 24. It specifically asked FOH to inquire of Matos's doctors whether other accommodations, such as the use of masks and filters, would alleviate her symptoms and allow her to work in the office. Id. FOH provided a supplemental report on November 13, 2014, in which it reversed its earlier disability determination. Def.'s

---

[2] Matos disputes that she was able to telework as much as possible during this period. But the evidence she relies on does not create a genuine issue of material fact. That evidence indicates that she was required to be physically present in the office *on some days*, which does not contradict the fact that she was allowed to telework *as much as possible*. See Def.'s MSJ Ex. 15 (April 8, 2014 email). Moreover, Matos herself testified in her deposition that she was allowed to telework until June or July 2014. Matos Dep. 27:21–28:4.

MSJ Ex. 25.  FOH concluded that Matos had not sufficiently documented her disability in light of inconsistencies in the information she had provided, such as her work outside the office as a consultant for a skincare company that did not appear to sell hypoallergic or fragrance-free products.  Id.

Following FOH's supplemental report, the Department formally denied Matos's request for 100% telework on January 22, 2015.  Def.'s MSJ Ex. 26.  The Department based its denial on two rationales: (1) that Matos had provided "insufficient information . . . to substantiate that [she was] a person who has a disability" and (2) that the "essential functions of [Matos's] position are not amenable to permanent, full-time telework."  Id.  The denial letter also detailed additional accommodations the Department had proposed but that proved unsuccessful, namely (1) attempting to transfer Matos to another building, which Matos "indicated . . . did not work"; (2) allowing Matos to work in an office behind a closed door, which had not been successful as an accommodation; and (3) searching for a vacant position amenable to 100% telework to which Matos could transfer, which the Department had been unable to find.  Id.  Matos unsuccessfully appealed the denial to a more senior supervisor.  Def.'s MSJ Ex. 30.

Later that month, Matos provided additional medical documentation to substantiate her condition, which triggered a new accommodation request.  See Def.'s MSJ Ex. 31 (March 19, 2015 letter).  Following an additional report from FOH, this request was denied on March 19, 2015 for the same reasons as Matos's prior request.  Id.; see also Def.'s MSJ Ex. 36 (March 9, 2015 FOH report).  In response, Matos submitted yet more medical documentation in early April 2015.  See Def.'s MSJ Ex. 42 (April 20, 2015 FOH report).  Based on this latest round of documentation, FOH issued another report on April 20, 2015 concluding that Matos was a

qualified person with a disability and recommending telework "if it is administratively compatible for her position." Id.; see also Def.'s MSJ Ex. 43 (April 27, 2015 FOH report).

After receiving the April 2015 FOH reports, the Department again concluded that Matos's current position was not amenable to a 100% telework schedule and began searching for a vacant full-telework position for which Matos was qualified. See Def.'s MSJ Ex. 44 (July 20, 2015 offer letter). On July 20, 2015, the Department concluded no such positions existed, created a new (albeit lower-paid) position that was amenable to full-time telework, and offered Matos a voluntary transfer to that position. Id.[3] The Department asked Matos to accept or decline the offer within seven calendar days. Id.

In June 2015, while the search for a vacant position was ongoing, Matos for the very first time suggested another possible accommodation.[4] She raised the possibility of obtaining equipment that would allow her to work at the office, specifically an air cleaner with a custom filter for her office and a respirator mask that would enable her to leave her office for short periods of time such as to attend a meeting. Def.'s MSJ Ex. 45 (June 2015 email chain). In response, Monifa Martin, the Department's reasonable accommodation program manager, indicated the Department would prefer instead to reassign Matos to a position that allowed for

---

[3] The offer letter does not specify that the position was created for Matos, but other record evidence indicates it was and Matos does not dispute this fact. See, e.g., Def.'s MSJ Ex. 7, at 323 (Wilbanks EEO Affidavit).

[4] The specific date that Matos made this request is not apparent from the current record. In a June 22, 2015 email, Matos states that she mentioned the possibility of using the equipment "in an earlier conversation," but does not specify the date of that conversation. Def.'s MSJ Ex. 45 (June 2015 email chain). In her deposition she stated she made this request in June 2015 but did not provide an exact date. Matos Dep. 64:9.

100% telework because "there is no assurance that either item, or both combined items, would work in the office." Id. Matos thanked Martin for the update. Id.

After receiving the transfer offer on July 20, 2015, Matos again raised the possibility of purchasing the equipment. Def.'s MSJ Ex. 46 (July 2015 email chain). In response, the Department requested that Matos provide medical documentation showing that the equipment would remedy her condition. Id. This documentation was particularly needed given that Matos and her doctors had been "adamant that nothing except full time telework would be an effective accommodation." Id.; see also Def.'s MSJ Ex. 47 (July 24, 2015 email from FOH Dr. Neal Presant recommending the Department require medical documentation).

On July 27, 2015, Matos submitted a memorandum in response to the job offer. See Def.'s MSJ Ex. 48. In it, she expressed confusion about the lower salary for the position and inquired about the possibility of using the equipment instead. Id. The Department responded in a July 30, 2015 email that reiterated the salary for the job and again requested Matos provide adequate medical documentation for the desired equipment. Def.'s MSJ Ex. 46 (July 2015 email chain). The email directed Matos to either submit medical documentation for the equipment or convey her decision on the reassignment offer within 15 days calendar days, by August 14, 2015. Id. On that date, Matos emailed indicating that she had met with her doctors and would have medical documentation "by the end of the week." Def.'s MSJ Ex. 49 (August 2015 email chain). She again raised a question about the transfer position's salary. Id.

By August 27, 2015, no further medical documentation had been received from Matos. See Def.'s MSJ Ex. 50 (August 27, 2015 letter). Nevertheless, the Department wrote to Matos reiterating the open transfer offer, responding to her question about salary, and giving her until September 4, 2015 to respond to the job offer, noting that a failure to respond would be

considered a denial. Id. Shortly thereafter, on August 31, 2015, Matos finally submitted medical documentation regarding the equipment. Def.'s MSJ Ex. 49 (August 2015 email chain).

Matos arrived at the office for work on September 9, 2015, constructively rejecting the transfer offer. See Matos Dep. 73:19–20. That day, the Department informed her that it would obtain the equipment she had requested and would allow her to work remotely full-time while the items were being purchased. Def.'s MSJ Ex. 52 (Sept. 9, 2015 email). The equipment initially arrived on October 1, 2015. Def.'s MSJ Ex. 53 (Oct. 1, 2015 letter). However, it took several additional months and back-and-forth with Matos, until January 2016, to find the right configuration of equipment that worked to alleviate her symptoms. See Def.'s MSJ Ex. 54; id. Ex. 55 (email chains regarding obtaining the equipment).

The following fall, in October 2016, Matos filed suit against the Department. She alleged that it had discriminated against her on the basis of her disability by creating a hostile work environment and failing to provide a reasonable accommodation for her disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and the Rehabilitation Act, 29 U.S.C. § 794. Compl. ¶¶ 30–69. Her complaint sought monetary damages and equitable relief. Id. ¶¶ 42, 69, 71. Discovery having closed, the Department has moved for summary judgment on all of Matos's claims.

## II. Legal Standard

A party is entitled to summary judgment if it shows that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A factual dispute is "material" if the resolution "might affect the outcome of the suit under the governing law" and "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When, as here, the nonmoving party bears the burden of persuasion at trial, the moving party is entitled to summary judgment if it establishes the absence of evidence for an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In analyzing a motion for summary judgment, the Court must "examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to the nonmoving party." Robinson v. Pezzat, 818 F.3d 1, 8 (D.C. Cir. 2016) (internal quotation omitted).

Both the ADA and the Rehabilitation Act prohibit the federal government from discriminating against employees on the basis of disability. See 29 U.S.C. § 794; 42 U.S.C. § 12112. One such type of discrimination is the failure to provide an employee a reasonable accommodation for any disability. Typically, a plaintiff asserting such a claim under either the ADA or the Rehabilitation Act must prove that: (1) she has a disability within the meaning of the statute, (2) her employer had notice of her disability, (3) she was qualified to perform her job with a reasonable accommodation, and (4) her employer denied her such an accommodation. See, e.g., Solomon v. Vilsack, 763 F.3d 1, 9 (D.C. Cir. 2014) (Rehabilitation Act); Floyd v. Lee, 968 F. Supp. 2d 308, 326 (D.D.C. 2013) (ADA).[5]

In addition, both statutes prohibit employers from creating a hostile work environment for individuals based on their disability. See, e.g., Sanders v. Kelly, 180 F. Supp. 3d 35, 44 (D.D.C. 2016) (Rehabilitation Act); Floyd v. Lee, 85 F. Supp. 3d 482, 516 (D.D.C. 2015) (ADA). To prevail on such a claim, a plaintiff must show that "his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

---

[5] Because the Rehabilitation Act and the ADA have similar standards for the most part, courts generally use cases interpreting the two statutes interchangeably. See, e.g., Chenari v. George Washington Univ., 847 F.3d 740, 746 (D.C. Cir. 2017).

conditions of [his] employment and create an abusive working environment." Baloch v.

Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (internal quotation omitted).

## III. Analysis

Matos's complaint raises a failure to accommodate claim and a hostile work environment

claim under both the ADA and the Rehabilitation Act. The Department argues that it is entitled

to summary judgment because Matos has failed to present sufficient evidence to support either

claim. The Court agrees and will grant the Department's motion.

### A. Failure to Accommodate

As noted above, Matos ultimately received the reasonable accommodation she

requested—the filter and mask. She therefore advances two alternative theories to support her

failure to accommodate claim. First, she contends that the Department did not engage in the

interactive process in good faith. Pl.'s Opp'n at 26–28. Second, she maintains that the

Department unduly delayed in granting her an accommodation. Id. 28–31.

#### 1. *Whether the Department engaged in the interactive process in good faith*

Under the Rehabilitation Act and the ADA, an employee's notification that she has a

disability and request for an accommodation triggers an "interactive process"—a "flexible give-

and-take between employer and employee so that together they can determine what

accommodation would enable the employee to continue working." Ward v. McDonald, 762 F.3d

24, 32 (D.C. Cir. 2014) (internal quotation omitted). Both parties are supposed to engage in this

interactive process in good faith, and neither "should be able to cause a breakdown in the process

for the purpose of either avoiding or inflicting liability." Id. To determine whether the employer

held up its end of the bargain, courts look to factors such as whether the employer "obstructs or

delays the interactive process" or "fails to communicate, by way of initiation or response." Id.

As an initial matter, the Court is skeptical that Matos has raised a proper claim as a matter of law. "There is no independent cause of action for failure to engage in the interactive process—under the ADA and in turn, the Rehabilitation Act, there is only a cause of action for failure to accommodate generally." Doak v. Johnson, 19 F. Supp. 3d 259, 278 n.20 (D.D.C. 2014). Rather, plaintiffs in such cases typically point to accommodations that they failed to receive as a result of the breakdown in the interactive process. See, e.g., Ward, 762 F.3d at 33–35 (rejecting argument that employer was liable for the breakdown in the interactive process). Since Matos does not contest that she ultimately received a reasonable accommodation and thus that the interactive process ended favorably, it appears that she has simply brought a freestanding claim for failure to participate in the interactive process in good faith.

In any event, Matos has not offered sufficient evidence to raise a triable question of whether the Department engaged in the interactive process in good faith. For one, Matos ultimately received precisely the accommodation she requested, namely the filter and mask, relatively soon after requesting it. She requested this equipment around June 2015, finally submitted medical documentation to support that request on August 31, 2015, and was informed on September 9, 2015 that the Department would purchase the desired equipment. See Def.'s MSJ Ex. 45 (June 2015 email chain); id. Ex. 49 (August 2015 email chain); id. Ex. 52 (Sept. 9, 2015 email). While it took additional time to get the right equipment, Matos was accommodated in the interim with a temporary full-time telework schedule. Matos Dep. 77:14–18, 84:24–85:4. The Department's willingness to provide the specific accommodation Matos requested soon after it received adequate medical documentation to support her request is hardly a sign of bad faith.

And prior to Matos's request for the equipment, the Department suggested and tried multiple other accommodations besides full-time telework. At her request, Matos was given a

private office with a closed door. Matos Dep. 12:13, 22:3–4. The Department offered to assign Matos to work in a different building, which she rejected. Def.'s MSJ Ex. 26 (Jan. 22, 2015 letter). The Department attempted to find an alternative position for Matos that was amenable to full-time telework. Id.; Def.'s MSJ Ex. 23 (July 21, 2014 email); id. Ex. 44 (July 20, 2015 offer letter). When it could not find a vacant position, it created a new one—something the Department was not legally required to do, see Aka v. Washington Hosp. Center, 156 F.3d 1284, 1305 (D.C. Cir. 1998)—that would allow Matos a full-time telework schedule. See Def.'s MSJ Ex. 44 (July 20, 2015 offer letter). The Department's proposals for alternative accommodations further illustrate that it engaged in the interactive process in good faith.

Matos makes much of the Department's purported failure to adhere to internal policy indicating it should respond to any accommodation request within 15 days.[6] Pl.'s Opp'n at 27. But she cites no cases indicating that any such failure alone suffices to show a lack of good faith. And the evidence in the record indicates that the Department was diligent in keeping Matos informed throughout the process. Wilbanks was in touch with her on April 8, 2014, within two weeks of the initial 100% telework request on March 26, 2014. Def.'s MSJ Ex. 15. The Department sent periodic follow-up letters the next few months while FOH reviewed Matos's request. See Def.'s MSJ Ex. 16 (May 5, 2014 letter); id. Ex. 18 (June 18, 2014 letter); id. Ex. 19 (June 26, 2014 letter); id. Ex. 20 (July 3, 2014 letter). Matos received the FOH report within two weeks of it being issued, by July 21, 2014, and discussed it with Wilbanks that same day. Def.'s MSJ Ex. 22; id. Ex. 23 (July 2014 emails).

Matos's later requests were also met with reasonably prompt responses. She emailed a

---

[6] What precisely Matos expected the Department to do within 15 days is not entirely clear from her briefing. See Pl.'s Opp'n at 27.

more senior supervisor on February 5, 2015 to appeal the January 2015 denial of 100% telework, and received an acknowledgment of her appeal on February 10, 2015 and a final response on February 20, 2015.  See Def.'s MSJ Ex. 29 (Feb. 2015 email chain); id. Ex. 30 (Feb. 20, 2015 denial letter).  After she submitted further documentation in late February, she received a written denial a month later on March 19, 2015.  Def.'s MSJ Ex. 31. When Matos submitted further information at the beginning of April 2015, she received a determination that she was a disabled individual and due an accommodation by the end of that month.  See Def.'s MSJ Ex. 42 (April 20, 2015 FOH report); id. Ex. 43 (April 27, 2015 FOH report).

The Department's responsiveness continued throughout the summer of 2015 while it worked on Matos's accommodation request.  Matos emailed on June 22, 2015 raising the possibility of purchasing equipment and received a response the next day, June 23, indicating the Department preferred to find her a position that was amenable to full-time telework since there was no guarantee the equipment would alleviate her symptoms.  Def.'s MSJ Ex. 45 (June 2015 email chain).  Matos again suggested purchasing equipment on July 21, 2015 and received a responsive email three days later, on July 24, stating she would need to provide medical documentation.  Def.'s MSJ Ex. 46 (July 2015 email chain).  When Matos requested further information about her job transfer offer and the possibility of equipment as an accommodation on July 27, 2015, she received an email response three days later.  Id.  And when Matos again asked for further information on the job transfer on August 14, 2015, she received a responsive letter within two weeks.  Def.'s MSJ Ex. 50.  This back and forth reveals that the Department consistently responded to Matos's requests with relative promptness and clearly strove to keep her informed throughout the process.

\* \* \*

At the end of the day, Matos received an accommodation that she does not contest is reasonable and meets her needs. Throughout the process, the Department proposed alternative accommodations, kept Matos informed, and responded relatively promptly to her questions and requests for information. No reasonable jury could conclude that it engaged in the interactive process in bad faith.

    2. *Whether the Department unduly delayed in granting Matos's accommodation*

    Matos next argues that even though she ultimately received an acceptable accommodation, the Department took too long to grant it. Pl.'s Opp'n at 28–31. The D.C. Circuit has recognized that "there are certainly circumstances in which a long-delayed accommodation could be considered unreasonable and hence actionable" under the ADA and Rehabilitation Act. Mogehan v. Napolitano, 613 F.3d 1162, 1168 (D.C. Cir. 2010) (internal quotation omitted); see also Mayer v. Laborers' Health & Safety Fund of N. Am., 478 F.3d 364, 368 (D.C. Cir. 2007) ("ADA accommodations must be 'reasonable,' and we are unsure how a long-delayed accommodation could be considered reasonable." (citation omitted)), abrogated on other grounds by Green v. Brennan, 136 S. Ct. 1769 (2016). In determining whether a particular delay is unreasonable, courts look to factors such as "the length of the delay, the reasons for the delay, whether the employer has offered any alternative accommodations while evaluating a particular request, and whether the employer has acted in good faith." Selenke v. Med. Imaging of Colorado, 248 F.3d 1249, 1262–63 (10th Cir. 2001).

    Considering the entirety of the record, the Court concludes that the length of time that passed from Matos's initial request in March 2014 until she received her equipment in January 2016 was not unreasonably long. While this period spans nearly two years, for over a year Matos and her doctors insisted that only 100% telework would suffice as an accommodation.

For its part, the Department suggested and attempted alternative accommodations, and properly concluded that Matos's desired accommodation was not a reasonable one because her supervisory and management duties required at least some physical presence in the office.  When Matos finally raised the filter and mask as an alternative proposal for the first time in June 2015, the Department handled her request diligently and obtained the equipment about five months after Matos submitted the required medical documentation.  Combining these reasons for the delay with the Department's good faith engagement in the interactive process discussed above and its efforts to provide interim accommodations while evaluating proposals, the Court finds that no reasonable jury could conclude the period of time that passed here, though lengthy, was unreasonable.

First, the reasons for the delay in obtaining an accommodation cut in the Department's favor.  The bulk of the delay stemmed from the Department's conclusion that full-time telework was not a reasonable accommodation given Matos's duties, which in turn required the Department to search for an alternative position that would allow for full-time telework.  Because that search lengthened the accommodation process, the Court will consider whether the Department's decision to conduct it was proper.

The Department concluded a full-time telework schedule for Matos's job was not a reasonable accommodation because Matos would be unable to perform her essential duties on such a schedule.  An accommodation is reasonable if it "allow[s] an employee to perform the essential functions of the job, without imposing undue hardship on the employee."  Saunders v. Galliher & Huguely Associates, Inc., 741 F. Supp. 2d 245, 249 (D.D.C. 2010); see also Morris v. Jackson, 994 F. Supp. 2d 38, 47 (D.D.C. 2013).  Courts look to a number of factors to determine an employee's essential duties, including "the employer's judgment as to which functions are

essential, written job descriptions the employer prepared for the position, the amount of time required to perform the function, the consequences to the employer of not requiring the activity, and the work experiences of past incumbents of the job in question and of similar jobs." Morris, 994 F. Supp. 2d at 47 (citing 29 C.F.R. § 1630.2(n)(3)).

Matos's essential duties, primarily her supervisory role over other employees and her need to meet with other officials and outside parties to carry out her tasks, required her to be in the office at least some of the time. Matos's job description, her deposition testimony, and the affidavit of her supervisor make clear that Matos's job involved supervising and training members of the IT staff and coordinating and overseeing the resolution of IT deficiencies for units within the Department. See, e.g., Def.'s MSJ Ex. 2, at 362–64 (Matos's official job description); Matos Dep. 34:1–35:22, 37:24–38:17, 38:24–39:4, 40:17–41:3; Def.'s MSJ Ex. 7, at 319–20, 323 (Wilbanks EEO Affidavit). She was also involved in overseeing periodic audits of the IT system, which required her to interact with auditors, IT staff members, and others. Def.'s MSJ Ex. 7, at 319–20 (Wilbanks EEO Affidavit); id. Ex. 15 (April 8, 2014 email).[7]

The evidence also establishes that these duties could not be adequately performed away from the office. For instance, Matos acknowledged that she had to stop personally facilitating training sessions when she was unable to come to the office in person, requiring a subordinate to fill in instead. Matos Dep. 35:15–16, 36:2–5, 36:11–17, 37:2–4. Similarly, Matos missed meetings related to the audits that she supervised; most of the meetings were in person and for "critical meetings" almost every attendee appeared in person. Def.'s MSJ Ex. 7, at 334

---

[7] Matos admitted in her deposition that she was involved in the audit process, Matos Dep. 61:8–11, and her description of her role is not inconsistent with the other record evidence of her role in the process. Compare id. 61:20–62:7 with Def.'s MSJ Ex. 7, at 319–20 (Wilbanks EEO Affidavit) and id. Ex. 15 (April 8, 2014 email).

(Wilbanks EEO Affidavit); see also id. Ex. 15 (April 8, 2014 letter). Other issues arose relating to Matos working remotely, such as auditing inaccuracies (requiring Wilbanks to have to assume responsibility for the audit instead) and problems during one year's security trainings. Def.'s MSJ Ex. 7, at 334 (Wilbanks EEO Affidavit); id. Ex. 37 (March 11, 2015 email).[8] In short, Matos's essential duties involved tasks requiring at least *some* physical presence in the office, and thus the Department properly concluded that full-time telework was not a reasonable accommodation. Some of the delay therefore arose from the Department's legitimate need to locate an alternative job position for Matos that would allow her to perform a job with a full-time telework schedule, such as the periods in 2014 and from May to July 2015 it spent hunting for such a job.

This need to find a vacant position was heightened by the fact that from the time of Matos's initial accommodation request in March 2014 until June 2015, the only possible accommodation she identified was full-time telework. In April 2014, FOH reported that her doctor "recommended telework ONLY" and "did not feel that there were any alternative accommodations that would be effective." Def.'s MSJ Ex. 21, at 376. None of the additional medical documentation that Matos provided in February and March of 2015 suggested any alternative accommodations. See Def.'s MSJ Ex. 32 (note from Nurse Practitioner Que); id. Ex.

---

[8] Matos has not offered sufficient evidence to create a factual question on these issues. In her deposition and affidavit, Matos says in a conclusory fashion that there were no issues with her working entirely remotely. See Matos Dep. 58:11–24; Pl.'s Opp'n Ex. 6, ¶ 15 (Matos Affidavit). But she points to no evidence rebutting the other record evidence providing specific examples of problems. Indeed, the one other piece of record evidence Matos points to—a job evaluation covering October 2013 to September 2014—in fact corroborates the other evidence: it specifically notes that there were issues with the audit process. See Pl.'s Opp'n Ex. 17. Furthermore, Matos herself recognizes that her inability to be in the office prevented her from "facilitating monthly meeting with her subordinates," Pl.'s Opp'n at 25, and from handling in-person training, Matos Dep. 35:15–16, 36:2–5, 27:2–4.

34 (letter from Dr. Hurtado); id. Ex. 41 (letter from Dr. Corella). Rather, until June 2015 she and her doctors "were adamant that nothing except full time telework would be an effective accommodation." Def.'s MSJ Ex. 46. As a result, part of the delay in Matos receiving the mask and filter arose from her own refusal to suggest any alternative accommodations.[9]

Part of the delay is also attributable to the period of time that the Federal Occupational Health service spent reviewing Matos's request and related medical documentation. FOH conducted these reviews from April 25, 2014 to July 8, 2014, September 4, 2014 to November 13, 2014, February 19, 2015 to March 9, 2015, and April 6, 2015 to April 27, 2015.[10] It is typical and entirely reasonable for the Department to request FOH's assistance in evaluating and implementing employees' accommodations. None of these review periods strike the Court as unduly long. And the Department acted promptly upon receiving FOH's reports. For instance, it began a job search for a vacant position by May 7, 2015, just over a week after receiving FOH's April 27, 2015 report. See Def.'s MSJ Ex. 44 (July 20, 2015 offer letter).

Finally, part of the delay in attaining the equipment as an accommodation is attributable to Matos's own actions. When the Department offered Matos an alternative position on July 20, 2015, it requested that she respond within seven calendar days. Def.'s MSJ Ex. 44. In response, Matos again raised the possibility of the Department obtaining equipment that would allow her to

---

[9] Matos also argues that the Department's delay was unreasonable because it failed to try *other* accommodations, such as conducting an inspection of the office. See Pl.'s Opp'n at 28. But the Department *did* attempt other accommodations: it gave Matos a private office, offered to move her to another building, and tried to locate a vacant position for her to transfer to that would allow a full-time telework schedule. See, e.g., Def.'s MSJ Ex. 26 (Jan. 22, 2015 letter).

[10] See Def.'s MSJ Ex. 14 (April 25, 2014 request letter); id. Ex. 21 (July 8, 2014 FOH report); id. Ex. 24 (Sept. 4, 2014 request letter); id. Ex. 25 (Nov. 13, 2014 FOH report); id. Ex. 35 (Feb. 20, 2015 request letter); id. Ex. 36 (March 9, 2015 FOH report); id. Ex. 42 (April 20, 2015 FOH report); id. Ex. 43 (April 27, 2015 FOH report).

come into the office.[11]  Def.'s MSJ Ex. 46 (July 2015 email thread).  She was informed three

days later on July 24—and again on July 31 and on August 27—that she needed to submit

medical documentation to support that request.  Id.; see also Def.'s MSJ Ex. 50 (August 27, 2015

letter).  Matos did not submit her medical documentation until August 31, 2015.  Def.'s MSJ Ex.

49 (August 2015 email chain).  Thus at least some of the delay in obtaining the equipment comes

from Matos's delay in providing the medical documentation needed to allow that request to

move forward.[12]

The Department's good faith engagement in the interactive process further indicates the

reasonableness of the delay.  As detailed above, the Department kept Matos informed, responded

reasonably promptly to her requests for information, and suggested and attempted alternative

accommodations for her to try.

Finally, the Department's provision of interim accommodations further buttresses the

conclusion that the delay here was not unreasonable.  For instance, the Department allowed

Matos to telework as much as possible between March 2014 and January 2015.  See, e.g., Def.'s

MSJ Ex. 15 (April 8, 2014 email); id. Ex. 18 (June 18, 2014 letter); id. Ex. 7, at 323, 325

(Wilbanks EEO Affidavit).  And of the roughly twenty-two month period spanning from Matos's

initial request in March 2014 until she received the equipment in January 2016, Matos spent

---

[11] Matos first raised equipment as a possible accommodation in June 2015.  She was informed on June 23, 2015 via email that because there were no assurances the equipment would work the Department was instead trying to find her a vacant transfer position that would allow 100% telework.  Def.'s MSJ Ex. 45 (June 2015 email chain).  Matos did not raise the equipment possibility again until after that search was completed and she received the transfer offer on July 20, 2015.  Def.'s MSJ Ex. 46 (July 2015 email chain).

[12] The Department was clearly justified in requiring Matos to provide such documentation, particularly in light of her previous insistence that only 100% telework would suffice as an accommodation.

around ten of those months—nearly half of that time—on *full-time* telework while others helped fulfill her on-site job responsibilities.[13]

In sum, given the reasons for the delay, the Department's good faith engagement in the accommodation process, and the Department's provision of alternative accommodations, the delay in granting Matos's final request was not unreasonable. Consequently, Matos was not denied a reasonable accommodation due to undue delay.

B.  Matos's Hostile Work Environment Claim

The Court now turns to Matos's hostile work environment claim. As noted, to establish that she suffered a hostile work environment, Matos must demonstrate that she was "subjected to discriminatory intimidation, ridicule, and insult" because of her disability that was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Elzeneiny v. District of Columbia, 125 F. Supp. 3d 18, 39–40 (D.D.C. 2015) (internal quotation omitted). The Department contends that Matos has not proffered sufficient evidence to carry this burden at trial.

To support her claim, Matos does not point to traditional indications of a hostile work environment such as disparaging comments, insults, ridicule, or harassment by co-workers or supervisors. Rather, she relies predominantly on: (1) similar arguments regarding delay in the accommodation process that she raises in her failure to accommodate claim, (2) a March 2015 letter reprimanding her for being absent without leave ("AWOL"), and (3) the Department's offer to transfer her to a lower-paying position. Because this evidence is insufficient for Matos

---

[13] Matos admitted that she teleworked full-time from April to September 2015, September 9, 2015 to October 5, 2015, and October 5, 2015 through January 2016. Matos Dep. 55:11–17, 62:8–20, 77:14–20, 84:24–85:4.

to prove a hostile work environment, the Court will grant the Department summary judgment on this claim as well.

Beginning with the reassignment offer, Matos contends that the Department's offer of a lower-paid job position is evidence of a hostile work environment.[14]  However, the Department was legally permitted to offer Matos a voluntary transfer to a lower-paid position as a reasonable accommodation of last resort.  Federal ADA regulations provide that "[a]n employer may reassign an individual to a lower graded position if there are no accommodations that would enable the employee to remain in the current position and there are no vacant equivalent positions for which the individual is qualified with or without reasonable accommodation."  29 C.F.R. Pt. 1630 App. § 1630.2(o).  And the employer "is not required to maintain the reassigned individual with a disability at the salary of the higher graded position if it does not so maintain reassigned employees who are not disabled."  Id.  The Department's own handbook confirms that it adheres to this policy.  See Pl.'s Opp'n Ex. 8, at 238–39.  In sum, "[b]oth the ADA regulations and the Department's procedure contemplate that, if no equivalent vacant position is available, an employee may be reassigned to an inferior position."  Harris v. Chao, 257 F. Supp. 3d 67, 82 (D.D.C. 2017).

Matos presents no evidence to rebut the fact that the Department conducted a search for an equivalently-paid position prior to offering her a voluntary transfer to a lower-paid position.  See Def.'s MSJ Ex. 26 (Jan. 22, 2015 letter); id. Ex. 7, at 323 (Wilbanks EEO Affidavit); id. Ex. 44 (July 20, 2015 offer letter).  Nor does she point to an available equivalently-paid position that

_____

[14] The record is unclear how much lower the new position paid.  Matos's salary at the time of the offer letter does not appear to be in the record.  However, her job description indicates that in 2011 she was paid $164,000.  See Def.'s MSJ Ex. 2 (job description).  In contrast, the new position offered a salary of $118,069.  Def.'s MSJ Ex. 44 (July 20, 2015 letter).

would have allowed full-time telework.  Finally, as discussed above, full-time telework was not a

reasonable accommodation and all other accommodations the Department suggested or tried

proved insufficient.  In the absence of another possible reasonable accommodation—recall that

Matos did not submit medical documentation for her request for equipment until *after* the

Department extended the transfer offer—the Department was legally permitted to offer Matos a

voluntary transfer to a lower-paid position when a reasonable search failed to find an

equivalently-paid vacant position amenable to 100% telework.  That it did so does not, without

more, make for a hostile workplace.

Nor can Matos fill the evidentiary gap with the arguments she raised (and the Court

rejected) as to her failure to accommodate claim.  To the extent that summary judgment is

appropriate to the Department on Matos's failure to accommodate claim, the same allegations

cannot support a hostile work environment claim.  See, e.g., Floyd, 85 F. Supp. 3d at 517 ("[I]f a

plaintiff could not prevail on a standalone failure-to-accommodate claim, the same alleged lack

of accommodation could not constitute 'severe or pervasive' harassment for purposes of a hostile

work environment claim.").

Finally, the single AWOL reprimand letter that Matos points to is insufficient to prove a

hostile work environment.  On March 9, 2015, Matos was issued a written reprimand for failing

to properly request leave before missing two days of work.  Def.'s MSJ Ex. 28.  Matos argues

that the reprimand was unjustified and discriminatory.  Opp'n at 33–34.  But even if it were so—

which the Department disputes, of course—a letter of reprimand does not rise to the level of a

hostile work environment.  Rather, "courts have generally rejected hostile work environment

claims that are based on work-related actions by supervisors."  Wade v. District of Columbia,

780 F. Supp. 2d 1, 19 (D.D.C. 2011); see also Brooks v. Grundman, 748 F.3d 1273, 1276 (D.C.

Cir. 2014) ("[S]elective enforcement of a time and attendance policy does not necessarily indicate conduct giving rise to a hostile work environment claim.").

In any case, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). A single letter of reprimand for missing work is hardly such an "extremely serious" incident. Standing alone, it does not reveal a work environment pervaded by intimidation or ridicule.

In sum, Matos has failed to proffer evidence to establish that the Department's conduct was inappropriate, let alone severe or pervasive enough to create a hostile work environment.

## IV. Conclusion

At the end of the day, Ms. Matos received a reasonable accommodation. While it may not be the first accommodation she requested or wanted, the Department "is not required to provide an employee that accommodation [she] requests or prefers" but rather "need only provide some reasonable accommodation." Aka, 156 F.3d at 1305. The Department did so without unreasonable delay and in good faith. Nor does Matos point to sufficient evidence demonstrating a hostile work environment. The Department is therefore entitled to summary judgment on both of Matos's claims.

For the foregoing reasons, the Court will grant the Department's Motion for Summary Judgment. A separate Order shall accompany this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: _August 13, 2018_____